# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

CLIFFORD WILBUR,

        Petitioner,

vs.                              Case No.:    3:13-cv-127-J-34JRK
                                                      3:09-cr-79-J-34JRK

UNITED STATES OF AMERICA,

        Respondent.

_____/

## <u>ORDER</u>

This case is before the Court on Petitioner Clifford Wilbur's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 1, Motion to Vacate) and Supporting Memorandum (Doc. 2, Supporting Memorandum).[1] The United States filed a response in opposition (Doc. 8, Response), and Wilbur replied to the government's Response (Doc. 11, Reply).  The Motion to Vacate was timely filed.

Pursuant to 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings[2], the Court has considered the need for an evidentiary hearing and determines that an evidentiary hearing is not necessary to resolve the merits of this action.  <u>See</u> <u>Aron v. United States</u>, 291 F.3d 708, 714–15 (11th Cir. 2002) (indicating that an evidentiary hearing on a § 2255 petition is not required when the petitioner asserts allegations that are affirmatively contradicted by the record or patently frivolous, or if in

---

[1]     Citations to Wilbur's criminal case file, <u>United States of America v. Clifford Wilbur</u>, 3:09-cr-79-J-34JRK, are denoted as "Crim. Doc. ___."  Citations to Wilbur's civil § 2255 case file, 3:13-cv-127-J-34JRK, are denoted as "Doc. ___."

[2]     Rule 8(a) of the Rules Governing Section 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before deciding on a § 2255 motion.

assuming the facts that he alleges are true, he still would not be entitled to any relief); Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989) (concluding that a petitioner's ineffective assistance claim can be dismissed without an evidentiary hearing when the petitioner alleges facts that, even if true, would not entitle him to relief); Dickson v. Wainwright, 683 F.2d 348, 351 (11th Cir. 1982) ("On habeas a federal district court need not conduct an evidentiary hearing if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel."); Patel v. United States, 252 F. App'x 970, 975 (11th Cir. 2007).[3]  For the reasons set forth below, Wilbur's Motion to Vacate is due to be denied.

## I.  Background

### A. Indictment, Motion to Suppress, and Trial

On July 8, 2009, a grand jury in the Middle District of Florida indicted Wilbur on two counts of distributing crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts One and Two), and one count of possessing five grams or more of crack cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count Three).  (Crim. Doc. 31, Superseding Indictment).  Shortly after the Superseding Indictment was filed, the United States filed an information to establish a prior conviction in order to enhance Wilbur's sentence on Count Three, pursuant to 21 U.S.C. § 851(a)(1).  (Crim. Doc. 33, Information).  Under § 841(b)(1)(B), a prior conviction for a drug felony increases the mandatory minimum term of imprisonment from five years

---

[3]  Although the Court does not rely on unpublished opinions as precedent, they may be cited throughout this Order as persuasive authority on a particular point.  Rule 32.1 of the Federal Rules of Appellate Procedure expressly permits the Court to cite to unpublished opinions that have been issued on or after January 1, 2007.  Fed. R. App. P. 32.1(a).

to ten years, and raises the statutory maximum sentence from 40 years to life in prison. See 21 U.S.C. § 841(b)(1)(B) (2006).

The charges in the Indictment arose from three separate events.  On April 25, 2008, in St. Johns County, Florida, Wilbur sold crack cocaine to an undercover informant who was wearing an audio/video recording device.  (Crim. Doc. 90, USA's Trial Memorandum at 1-2).  This transaction formed the basis of Count One.  On May 1, 2008, Wilbur sold crack cocaine a second time to the same informant, who again was wearing an audio/video recording device.  Id. at 2-3.  This transaction formed the basis of Count Two.  On May 6, 2008, a St. Johns County Sheriff's Office deputy conducted a traffic stop of Wilbur's car because his windows appeared to be too darkly tinted.  Id. at 3.  During the stop, Wilbur appeared anxious.  (Crim. Doc. 75, Report and Recommendation on Motion to Suppress at 4).  A nearby canine unit arrived shortly, the canine sniffed around the car, and alerted officers to the scent of narcotics.  Id. at 5-6.  Officers searched the car "and discovered 16.8 grams of a waxy substance, which field testing determined to be crack cocaine," after which the officers arrested Wilbur.  Id. at 6.  This traffic stop formed the basis of Count Three.  USA's Trial Memorandum at 3-4.

Wilbur moved to suppress the evidence seized from the May 6, 2008 traffic stop, arguing that officers unreasonably prolonged his detention in order to conduct a canine sniff.  (Crim. Doc. 68, Motion to Suppress).  The Court denied Wilbur's motion following an evidentiary hearing, finding that the traffic stop was lawful and that officers did not unreasonably extend Wilbur's detention.  (See Crim. Doc. 96, Order Adopting Report and Recommendation on Motion to Suppress).

At trial, the government introduced the testimony of the informant who purchased crack cocaine from Wilbur (Crim. Doc. 147, Trial Tr. Vol. I at 60-118), the law enforcement officers who found Wilbur in possession of crack cocaine (Crim. Doc. 148, Trial Tr. Vol. II at 115-84), and a forensic chemist from the Drug Enforcement Administration who confirmed that the substance was cocaine, id. at 184-91.[4]  The chemist testified that, after excluding impurities, one sample contained 2.4 grams of cocaine base and another contained 16.4 grams.  Id. at 187, 190.  The informant, Norman Sanks, identified Wilbur as the person who sold him narcotics during the undercover operation.  Trial Tr. Vol. I at 62-118.  Additionally, a detective familiar with Wilbur recognized his voice from one of the informant's audio recordings.  Id. at 134-35.  The United States also introduced a video recording from one of the informant's encounters, which depicted the seller as a man with a distinctive tattoo on his right arm.  The tattoo matched a tattoo on Wilbur's right arm, which the jury had an opportunity to view and compare with the video.  See Trial Tr. Vol. II at 83, 105-06.  As for Wilbur, his defense was that he was not the person who sold crack cocaine to the informant, that the cocaine discovered in his car did not belong to him, and that the Court should enter a judgment of acquittal on Counts One and Two because the government's informant was not credible.  See Response at 15; see also Trial Tr. Vol. I at 99-117; Trial Tr. Vol. II at 131-32, 200-07.  The Court denied Wilbur's motion for judgment of acquittal, and on April 15, 2010, the jury returned a guilty verdict as to all three counts.  (Crim. Doc. 110, Jury Verdict).

---

[4]     Wilbur, his attorney, and the prosecutor also each affixed their signatures to a stipulation that the substance was indeed cocaine base, and that the chain of custody was proper.   (Crim. Doc. 105, Stipulation).

### B. Sentencing

Approximately four months after the jury convicted Wilbur, but before Wilbur's sentencing hearing, the Fair Sentencing Act (FSA) of 2010 became law.  See Pub. L. No. 111-220, 124 Stat. 2372 (Aug. 3, 2010).  The FSA raised the amount of cocaine base required to qualify for the sentences set forth under 21 U.S.C. § 841(b)(1)(B) from 5 grams to 28 grams.  See 21 U.S.C. 841(b)(1)(B)(iii) (2010).  At the time however, there was uncertainty about whether the FSA applied to those who, like Wilbur, were convicted before enactment of the FSA and not yet sentenced.

The Court received a Presentence Investigation Report (PSR), which attributed 19.78 grams of cocaine base to Wilbur and, as such, set his base offense level under the United States Sentencing Guidelines ("Guidelines") at 22.  PSR at 5.  However, because he had two prior felony convictions in Florida for the sale of cocaine, because the instant offenses of conviction involved a controlled substance, and because Wilbur was over 18 years old at the time he committed the relevant offenses, the PSR determined that he qualified to be sentenced as a career offender under U.S.S.G. § 4B1.1 (2010).  Id. at 6.  Given Wilbur's designation as a career offender, and because his statutory maximum penalty under the pre-FSA version of 21 U.S.C. § 841(b)(1)(B) was life in prison (on account of distributing more than 5 grams of cocaine base and having a prior felony drug conviction), his total offense level became 37.  PSR at 6; see also U.S.S.G. § 4B1.1(b)(A) (2010).  Moreover, because Wilbur qualified as a career offender, his Guidelines criminal history category was automatically VI.  PSR at 16; see also U.S.S.G. § 4B1.1 (2010).  With a total offense level of 37 and a criminal history category of VI, Wilbur's advisory

sentencing range under the Guidelines was a term of 360 months-to-life in prison. U.S.S.G. Sentencing Table (2010).

The Court received sentencing memoranda from both parties.  (See Crim. Doc. 116, USA's Sentencing Memorandum; Crim. Doc. 133, Wilbur's Sentencing Memorandum).  The United States defended the PSR's Guidelines calculation, while Wilbur raised two arguments relevant here.  First, Wilbur contended that the FSA should retroactively apply to him.  Wilbur's Sentencing Memorandum at 4-16.  Were the FSA applied to Wilbur, he would have faced a maximum sentence of 30 years in prison and no mandatory minimum under 21 U.S.C. § 841(b)(1)(C), because he had less than the 28 grams of cocaine required for the penalties set forth under the post-FSA version of § 841(b)(1)(B).[5]  Additionally, applying the FSA to Wilbur (thereby lowering his statutory maximum penalty from life to 30 years) would have lowered his Guidelines offense level from 37 to 34,  U.S.S.G. § 4B1.1(b) (2010), which would have lowered his advisory Guidelines range from 360-months-to-life in prison to between 262 and 327 months, see U.S.S.G. Sentencing Table (2010).  Second, Wilbur challenged his designation as a career offender under U.S.S.G. § 4B1.1.  Wilbur's Sentencing Memorandum at 16.  Wilbur argued that because a state court sentenced him on the same day in September 2002 to concurrent terms for his two prior drug convictions, they should be treated as a single prior offense rather than two separate convictions.  Id. at 1-3, 16.

At the sentencing hearing on June 6, 2011, Wilbur through counsel conceded the second argument, i.e., whether he qualified as a career offender under U.S.S.G. § 4B1.1, and acknowledged that probation had properly designated him as such on account of the

---

[5]    Wilbur still would have qualified for the enhanced 30-year maximum sentence under § 841(b)(1)(C) because he had a prior felony drug conviction.

two prior drug convictions.  (Crim. Doc. 150, Sentencing Tr. at 3, 16-17).  Nevertheless, Wilbur argued that the Guidelines range for a career offender was unreasonable, and that a more reasonable sentence would lie within the Guidelines range applicable without the application of the career offender enhancement, or a range of 84 to 105 months.  See id. at 19-20.  Wilbur continued to maintain that the FSA should apply retroactively, and that if it did apply retroactively, the government's § 851 enhancement should not apply.  See id. at 19-34.  The United States responded that in four separate opinions, the Eleventh Circuit had concluded that the FSA does not apply to those who were convicted before the act became law but who were awaiting sentencing.  (Sentencing Tr. at 34-37; Crim. Doc. 134, USA's Supplemental Authority) (citing United States v. Gomes, 621 F.3d 1343 (11th Cir. 2010); United States v. Mickens, 408 F.App'x 253 (11th Cir. 2011); United States v. Bradley, 409 F.App'x 308 (11th Cir. 2011); United States v. Coleman, 416 F.App'x 41 (11th Cir. 2011)).  As such, the United States defended the PSR's Guidelines calculation of an offense level of 37, a Criminal History Category of VI, and an advisory range of 360-months-to-life in prison.  The United States nonetheless recommended a sentence of 240 months – well below Wilbur's Guidelines range.  Sentencing Tr. at 44-45.

The Court agreed that the FSA did not apply retroactively under Eleventh Circuit precedent, id. at 37-43, and further agreed that the Guidelines calculation set forth in the PSR was correct, id. at 44.  Ultimately, however, the Court sentenced Wilbur to a term of 195 months in prison on Count Three, running concurrently with sentences of 120 months in prison on Counts One and Two, followed by an eight-year term of supervised release.  Id. at 96.  The Court explained that it considered a sentencing range of 360-months-to-

life in prison to be too high, but that the ten year mandatory minimum was too low in light of Wilbur's prior convictions.  Taking into account Wilbur's criminal history and his physical health, the Court explained that a term of 195 months was sufficient, but not greater than necessary, to promote respect for the law, just punishment, and deterrence.  Id. at 96-104.

Wilbur appealed his conviction and sentence to the Eleventh Circuit, where he challenged the Court's denial of his motion to suppress and a motion for a mistrial.  See generally, Brief of Appellant, United States v. Wilbur, 458 F.App'x 829 (11th Cir. 2012) (No. 11-11396) (submitted November 23, 2011).  Wilbur did not appeal the Court's determination that the FSA did not apply retroactively.  Five days after submitting his brief, the Supreme Court granted certiorari review to determine whether the FSA applied to those convicted before the law's enactment but subject to sentencing afterward.  Dorsey v. United States, 132 S. Ct. 759 (November 28, 2011).  On February 21, 2012, the Eleventh Circuit affirmed Wilbur's convictions.  Wilbur, 458 F.App'x at 830-31.  Wilbur did not petition the Supreme Court for certiorari review.  On June 21, 2012, the Supreme Court held that the FSA does apply to defendants who, like Wilbur, were convicted before the FSA's enactment but subject to sentencing afterward.  Dorsey v. United States, 132 S. Ct. 2321 (2012).

## II.    Wilbur's Motion to Vacate

Wilbur timely filed the instant § 2255 motion on January 31, 2013.  Wilbur raises eight grounds: (1) that the government committed a Brady[6] violation by failing to disclose

---

[6]      Brady v. Maryland, 373 U.S. 83 (1963) (due process requires that the government disclose exculpatory evidence within its actual or constructive possession to the defendant).

that an evidence technician with the St. Johns County Sheriff's Office, Paul Matthew Robinson, was under investigation for evidence tampering and stealing prescription drugs[7], (2) that counsel rendered ineffective assistance by failing to object to an all-white jury pool; (3) that the Court violated his Fifth and Eighth Amendment rights by failing to sentence him under the FSA; (4) that the Court violated his Fifth and Eighth Amendment rights by sentencing him as a career offender under U.S.S.G. § 4B1.1; (5) that counsel rendered ineffective assistance by failing to object that the drug evidence was not in the same form as it was reported in Wilbur's arrest report; (6) that the government violated his Confrontation Clause rights by "hiding" a law enforcement witness; (7) that his enhancement under 21 U.S.C. § 851, on account of a prior drug conviction under Florida law, was unconstitutional, and (8) that appellate counsel rendered ineffective assistance by failing to raise several of the aforementioned grounds for direct review.  The Court will address Wilbur's allegations of governmental misconduct (Grounds One and Six) and trial court error (Grounds Three, Four, and Seven) before turning to his ineffective assistance of counsel claims (Grounds Two, Five, and Eight).

## III.   Discussion

Pursuant to Title 28, United States Code, Section 2255, a person in federal custody may move to vacate, set aside, or correct his sentence.  Section 2255 permits such

---

[7]      Links to news stories about the arrest of St. Johns County evidence technician Paul Matthew Robinson are available at http://jacksonville.com/community/my_st_johns_sun/2009-11-25/story/st_johns_evidence_tech_caught_with_confiscated_pain_pills;http://jacksonville.com/community/my_st_johns_sun/2009-11-28/story/evidence_technician_jailed_on_charges_of_narcotics_theft; http://staugustine.com/news/local-news/2010-04-16/ex-sheriffs-employee-jailed-drug-thefts#.VU0jDflVhBc; and http://www.news4jax.com/news/Ex-Deputy-Accused-Of-Stealing-Evidence/2025458.
        For purposes of assuring an accurate record, the Court attaches as Composite Exhibit A to this Order copies of all news stories referenced in this Order.

collateral challenges on four specific grounds: (1) the imposed sentence was in violation of the Constitution or laws of the United States; (2) the court did not have jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack.  28 U.S.C §2255(a) (2008).  Only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack.  United States v. Addonizio, 442 U.S. 178, 184-86 (1979). A petitioner's challenge to his sentence based on a Sixth Amendment claim of ineffective assistance of counsel is normally considered in a collateral attack.  United States v. Teague, 953 F.2d 1525, 1534 n. 11 (11th Cir. 1992).

For the reasons set forth below, Wilbur's claims are either refuted by the record, procedurally defaulted, or without merit as a matter of law.

## A. Ground One:  Whether the government violated Brady by not disclosing the arrest and investigation of a St. Johns County Sheriff's Office evidence technician

Wilbur contends that the government suppressed information about an evidence technician, Paul Robinson, who was arrested for tampering with prescription drug evidence in several unrelated cases in St. Johns County, Florida.  Wilbur asserts that Robinson also tainted the evidence in his case, and as proof, says the arrest report and the DEA lab report contain discrepancies in the description of the drugs seized. (Memorandum at 1-5; see also Doc. 11-4, Ground Five Exhibit).

The government has a constitutional obligation to disclose exculpatory evidence in its possession to a defendant.  Brady, 373 U.S. at 87.  The elements of a Brady violation are: (1) that the prosecution possessed evidence favorable to the defendant; (2) that the

defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.  United States v. Bailey, 123 F.3d 1381, 1397 (11th Cir. 1997).

With respect to Ground One, the claim fails to satisfy the second, third, and fourth prongs of the Bailey test.  Most apparent, the government neither suppressed evidence of the technician's alleged evidence-tampering, nor was such evidence inaccessible to Wilbur with due diligence.  Several local media outlets reported Robinson's arrest for evidence-tampering months in advance of Wilbur's trial.  See p. 9 n.8, supra.  Two news reports on Robinson's arrest were published on November 25, 2009 – four and a half months before Wilbur's trial began.[8]  Another report was published on November 28, 2009.[9]  Because the story was publicly disseminated, there is no indication that the government made any effort to suppress it.  The government also disclosed lab reports and documents relating to the chain of custody of the evidence (see Doc. 11-1, Ground One Exhibit; Doc. 11-4, Ground Five Exhibit), so the government gave Wilbur the ability to determine whether Robinson had come into contact with the evidence.  Moreover, Wilbur could have discovered the information about Robinson with reasonable diligence because (1) the matter was publicly reported more than four months before his trial, and (2) the government turned over documents disclosing which personnel came into contact

---

[8]       See http://staugustine.com/news/local-news/2009-11-25/sheriffs-employee-arrested#.VWRwyc9VhBc; http://historiccity.com/2009/staugustine/news/florida/sheriffs-office-arrests-own-evidence-technician-2150
[9]       See http://jacksonville.com/community/my_st_johns_sun/2009-11-28/story/evidence_technician_jailed_on_charges_of_narcotics_theft

with the evidence.  Accordingly, there is no support for the claim that the government tried to suppress evidence with respect to Robinson's alleged evidence-tampering.

Equally fatal to Wilbur's <u>Brady</u> claim is the absence of any indication that Robinson actually tampered with any of the cocaine evidence in Wilbur's case.  Notably, the St. Johns County Sheriff's Office conducted an audit of the cases affected by Robinson's activities, and there is no indication that the audit identified Wilbur's case as among them. <u>See</u> Ground One Exhibit at 7-10.[10]  Indeed, the technician almost exclusively stole pain killers in cases involving prescription drugs, <u>id.</u> at 9-10[11], and there is no indication that the technician ever tampered with crack cocaine evidence, whether in Wilbur's case or any other.  Thus, the record fails to support any reasonable probability that, had the government affirmatively disclosed the complete story of the technician's arrest and investigation, the outcome of the trial would have changed.

Wilbur points to alleged discrepancies between the arrest report and the DEA lab report as support for the claim that there was evidence-tampering.  Although Wilbur contends that the evidence as described in the DEA lab report differs from the evidence as described in the arrest report, this is not necessarily an accurate statement.  The only noticeable differences between the two reports are as follows: (1) the arrest report

---

[10]     Wilbur attached selected portions of the report and audit on Robinson's theft of evidence, but it is nonetheless apparent that Wilbur's case was unaffected.  Wilbur attached one page of an audit spreadsheet, which detailed the "Case Numbers" affected by Robinson's activities and what evidence was taken. (Doc. 11-1 at 8). Wilbur's "Case Number" was 08OFF006699. (<u>Id.</u> at 7). The spreadsheet includes information for other 2008 and 2009 cases, but significantly, Wilbur's case number does not appear among them.  Rather, Wilbur merely points out that there was suspicious activity by Robinson – in an unrelated case – on the same day that Robinson submitted Wilbur's evidence to the Florida Department of Law Enforcement (FDLE).  (<u>See</u> Doc. 11-1 at 5, 8).  That is inadequate to support any inference that Robinson tampered with the evidence in <u>Wilbur</u>'s case.

          Wilbur asks the Court to speculate that his case might have been among those affected because, while the FDLE was auditing the St. Johns County Sheriff's Office evidence records, there was a computer crash and some data was lost.  However, such speculation does not warrant habeas relief or an evidentiary hearing under § 2255.

[11]     Robinson did allegedly steal cannabis in one case.

described the quantity of the substance in terms of individual pieces (75 of them), whereas the DEA lab report described the quantity in terms of grams (45.1 grams, gross weight), compare Doc. 11-4 at 3 with id. at 5; and (2) the arrest report describes the drug evidence as a "white and brown waxy substance," whereas the DEA report describes the evidence as an "[o]ff-white solid substance," compare id. at 3 with id. at 5.  These descriptions are slightly different, but they are not inconsistent.  Certainly, neither of these descriptions is so inconsistent as to support a reasonable inference that, sometime between Wilbur's arrest and the submission of the drug evidence for DEA lab-testing, Robinson tampered with the evidence.

Moreover, the substance recovered from Wilbur's car tested positive for crack cocaine according to a field testing kit.  See Report and Recommendation on Motion to Suppress at 6.  Thus, there was evidence that Wilbur was in possession of crack cocaine before any of the evidence passed through the technician's custody.  The same evidence subsequently went to a DEA lab for analysis, where a chemist also confirmed that it was cocaine base.  It is noteworthy that the report on Robinson's activities indicated that his modus operandi was to steal prescription drugs after forensic testing had been completed on them. Ground One Exhibit at 9.  Assuming Robinson would adhere to that pattern, there would be no reason to believe that Robinson's actions compromised the results of the DEA lab analysis here.

Finally, the Court notes that Wilbur himself, along with his attorney, stipulated that the chain of custody of the drug evidence was proper, and that the substance was in fact cocaine base.  Stipulation at 1-2.[12]  Accordingly, there would have been no basis for a

---

[12]    Wilbur does not contend that the stipulation was unknowing or involuntary.  Accordingly, this alone could refute any claim of prejudice from the government's alleged Brady violation.

jury to believe that the technician had tainted the evidence in <u>Wilbur's</u> case.  In light of the foregoing, there is not a reasonable probability that a jury would have acquitted Wilbur, even had it known the details about Robinson's arrest for stealing prescription drug evidence.

## B. Ground Three:  Whether the Court erred by not sentencing Wilbur under the Fair Sentencing Act of 2010

Wilbur contends that the Court violated his rights under the Fifth and Eighth Amendments by not sentencing him in accordance with the FSA.  It is true that the Supreme Court ruled in <u>Dorsey v. United States</u> that the FSA's more lenient provisions apply to those who, like Wilbur, were convicted before the Act became law, but who were still awaiting sentencing on the date of its enactment.  132 S. Ct. at 2326.  It is also true that this Court, following then-existing binding precedent (because <u>Dorsey</u> had not yet been decided), sentenced Wilbur without applying the FSA.  Wilbur is not entitled to relief, however, because (a) the error was not of such a magnitude as to warrant relief under § 2255, and (b) the error did not affect his sentence.

Wilbur invokes the Fifth Amendment's promise of due process, and the Eighth Amendment's protection against cruel and unusual punishment, but he cites no authority holding that a court's failure to apply the Fair Sentencing Act to a defendant violates either of those guarantees, and the Court is aware of no such authority.  Certainly, <u>Dorsey</u> did not hold that the FSA applies to un-sentenced defendants as a matter of constitutional principle.   Rather, in the <u>Dorsey</u> decision the Supreme Court applied principles of statutory interpretation to reconcile a federal "saving statute", 1 U.S.C. § 109, which provides that the criminal penalties incurred under a repealed statute remain in effect "unless the repealing Act shall so expressly provide," with Congress's apparent (but not

explicit) intent to give the FSA immediate application.  See Dorsey, 132 S. Ct. at 2330-35.   The result was driven by a determination of congressional intent, not whether defendants have a constitutional right to retroactively benefit from an act of legislative grace.

     "Section 2255 does not provide a remedy for every alleged error in conviction and sentencing."  Spencer v. United States, 773 F.3d 1132, 1138 (11th Cir. 2014).  When a prisoner, like Wilbur, claims that his "sentence was imposed in violation of the Constitution or laws of the United States… or is otherwise subject to collateral attack," 28 U.S.C. § 2255(a), a court lacks authority to grant relief "unless the claimed error constitute[s] 'a fundamental defect which inherently results in a complete miscarriage of justice,'" Spencer, 773 F.3d at 1138 (quoting Addonizio, 442 U.S. at 185).  Such a miscarriage of justice occurs where a defendant is actually innocent, or where a defendant's sentence is "unlawful," as when the defendant and his counsel are denied the right to be present at the sentencing hearing, or where the sentence exceeds the statutory maximum.  See Spencer, 773 F.3d at 1138-39.  However, lesser errors are not cognizable on collateral review.

     No such miscarriage of justice occurred here.  When the Court declined to apply the FSA to Wilbur, the Court adhered to binding circuit precedent, which held that the FSA did not apply to those who were convicted before the new law's enactment.  See Gomes, 621 F.3d 1343; Mickens, 408 F.App'x 253; Bradley, 409 F.App'x 308; Coleman, 416 F.App'x 41.  At least one other circuit has indicated that where a district court merely followed binding precedent in declining to apply the FSA, such an error was not so

egregious as to warrant habeas relief.  Shaw v. United States, 604 F.App'x 473, 476-77 (6th Cir. 2015).

Moreover, Wilbur's sentence would still have been lawful had the Court applied the FSA.  The Court sentenced Wilbur to 195 months in prison, which would have been below the statutory maximum sentence even applying the FSA's new drug-quantity provisions.  Had the Court applied the FSA at Wilbur's sentencing, he still would have qualified for the penalties set forth under 21 U.S.C. § 841(b)(1)(C), because the jury still convicted Wilbur of possessing cocaine base with intent to distribute.  See Jury Verdict at 1-2.  Ordinarily, the maximum sentence under that subsection is a term of twenty years, or 240 months, in prison.  21 U.S.C. § 841(b)(1)(C).  Wilbur's 195 month sentence was well within that range.  In fact, Wilbur's maximum sentence under § 841(b)(1)(C) would have been even higher because he had a prior conviction for a drug felony, which made him eligible for a 30-year maximum sentence.  That only reinforces the point that even had the Court applied the FSA to Wilbur, his sentence would have been well within the lawful range.[13] Because Wilbur's sentence would not have exceeded the statutory maximum penalty even under the FSA's more lenient provisions, Wilbur has failed to establish either that his sentence was unlawful or that he suffered harm as a result of the Court's refusal to apply the FSA.  See Spencer, 773 F.3d at 1139 ("When a federal prisoner, sentenced

---

[13]    The Eleventh Circuit has held that mere error in calculating a defendant's advisory Guidelines sentence is not of a magnitude that warrants habeas relief. Spencer, 773 F.3d at 1138-40.  Nonetheless, the Court adds that Wilbur's Guidelines range was also unaffected by the decision not to apply the FSA. For most drug offenses, including Wilbur's, the Guidelines offense level is driven by specific offense characteristics (like the actual drug quantity) or offender history, not the statutory subsection under which the defendant is convicted.  Thus, while applying the FSA would have meant that Wilbur's conviction on Count Three would be under § 841(b)(1)(C) rather than § 841(b)(1)(B), this would have had no impact on his designation as a career offender pursuant to U.S.S.G. § 4B1.1.  Wilbur's career offender designation, in turn, is what determined his offense level and criminal history category, and therefore determined his advisory Guidelines range.

below the statutory maximum, complains of a sentencing error and does not prove either actual innocence of his crime or the vacatur of a prior conviction, the prisoner cannot satisfy the demanding standard that a sentencing error resulted in a complete miscarriage of justice.").

Indeed, this Court affirms that, given his criminal history and the other factors originally discussed at his sentencing hearing, see Sentencing Tr. at 96-104, the Court would still have imposed the same sentence even if it had applied the Fair Sentencing Act to him.

### C. Ground Four:  Whether the Court erred in sentencing Wilbur as a career offender under U.S.S.G. § 4B1.1

In Ground Four, Wilbur asserts that the Court erred in classifying him as a career offender under § 4B1.1 of the Guidelines.  (Motion to Vacate at 8).  Application of the career offender guideline requires that the defendant have two prior felony convictions for either a crime of violence or a controlled substance offense.   U.S.S.G. § 4B1.1(a). However, the "two prior felony convictions" must be for convictions the sentences for which are counted separately under the guidelines.   U.S.S.G. § 4B1.2(c)(2).   Section 4A1.2 defines when multiple prior sentences are counted separately:

> Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence. See also §4A1.1(e).

U.S.S.G. § 4A1.2(a)(2) (2010).  Wilbur does not dispute that he has two prior felony convictions for the sale of crack cocaine.  See PSR ¶¶ 58-59.  What Wilbur disputes in

the instant § 2255 motion, and what he also disputed in his sentencing memorandum, is whether there was an "intervening arrest" separating the two offenses which resulted in convictions.  Because the state court judge sentenced Wilbur on the same day for both prior offenses, the absence of an intervening arrest would require that the Court count the two convictions as only one, and thus Wilbur would not qualify for the career offender designation.  In support of the contention that there was no "intervening arrest," Wilbur cites the charging affidavit for the first cocaine offense, which reflects that he was arrested (Doc. 11-3, Ground Four Exhibit at 3), and the charging affidavit for the second cocaine offense, which does not reflect that he was arrested, id. at 4.  Thus, Wilbur contends that because he was not arrested for the second offense, there was no "intervening arrest," and therefore the Court erred in sentencing him as a career offender.

Wilbur challenges the Guidelines career offender designation in two different fashions, which require different treatment.  First, Wilbur challenges the career offender designation in Ground Four as an independent claim, which, as explained below, is not cognizable on habeas review.  Second, Wilbur indirectly challenges the career offender designation in Ground Eight, by claiming that appellate counsel rendered ineffective assistance by not raising it for direct review.  Such an ineffective assistance claim is cognizable on habeas review, but lacks merit here.

### 1.  As an independent claim

As in Ground Three, Wilbur contends that the Court violated his Fifth and Eighth Amendment rights by designating him as a career offender, but he cites no authority for the proposition that such an error rises to the level of a Fifth or Eighth Amendment violation.  To the contrary, the Eleventh Circuit held in Spencer that incorrectly designating

a defendant as a career offender – for Guidelines purposes – is not of a magnitude that warrants relief under § 2255.  773 F.3d at 1138-40.  As the court explained, the Guidelines are purely advisory; thus, a court could impose the same sentence with or without any individual Guideline determination, and the sentence would remain lawful as long as it is below the statutory maximum.  Id. at 1140 ("But any miscalculation of the guideline range cannot be a complete miscarriage of justice because the guidelines are advisory.  If the district court were to resentence Spencer, the district court could impose the same sentence again.") (citing Gilbert v. United States, 640 F.3d 1293, 1304 (11th Cir. 2011) (en banc)).  In so holding, the Eleventh Circuit identified two situations where a sentencing error would qualify as a "fundamental defect" appropriate for collateral review: (1) where the petitioner is actually innocent of his crime, and (2) where "a prior conviction used to enhance his sentence has been vacated."  Spencer, 773 F.3d at 1139.  Wilbur makes neither assertion here, and as such, he has not identified a sentencing error that is so fundamental as to warrant habeas relief.  Id. at 1140 ("A misapplication of advisory sentencing guidelines… does not violate an 'ancient' right, nor does it raise constitutional concerns.").  As previously noted, the Court sentenced Wilbur well below the statutory maximum sentence (whether or not one applies the FSA to him), so his sentence was not unlawful (whether or not one applies the Guidelines career offender designation to him).

### 2.  As ineffective assistance of appellate counsel

Issues that are not cognizable on habeas review might nevertheless have been meritorious on direct review.  See Lynn v. United States, 365 F.3d 1225, 1233 (11th Cir. 2004).  If a foregone issue had merit, a petitioner might have a viable claim for ineffective

assistance of appellate counsel if he can show that counsel performed in an objectively unreasonable manner by not raising it.  Such a circumstance is not present here.

Counsel had no reasonable basis to argue that Wilbur's prior cocaine offenses should not be counted separately under U.S.S.G. §§ 4A1.1, 4A1.2, 4B1.1, and 4B1.2 for purposes of the career offender determination.  Wilbur, in fact, qualified as a career offender because his prior cocaine offenses were separated by "an intervening arrest," as that term is used in U.S.S.G. § 4A1.2(a)(2).  Wilbur contends that there was no "intervening arrest" because he was not arrested for the <u>second</u> cocaine offense.  But that is not what U.S.S.G. § 4A1.2(a)(2) requires.  Section 4A1.2(a)(2) clarifies that "an intervening arrest" exists where "the defendant is arrested for the <u>first</u> offense prior to <u>committing</u> the second offense."  <u>Id.</u> (emphasis added).  The text of the Guidelines does not require an <u>arrest</u> on the <u>second</u> offense, as Wilbur contends.  Wilbur does not dispute that he was arrested for the first cocaine offense, that he was released, and while on release, he committed the second cocaine offense, as recounted both in the PSR and his own sentencing memorandum.  PSR at ¶¶ 58-59; Wilbur's Sentencing Memorandum at 2-3.  In other words, Wilbur (1) committed the first cocaine offense, then (2) he was arrested on the first cocaine offense, and (3) while on release, he committed the second cocaine offense; the arrest for the first cocaine offense separated the commission of the two offenses.  Therefore, an "intervening arrest" separated Wilbur's prior cocaine offenses, the Court properly counted them separately under § 4A1.2, and the Court properly classified him as a career offender.  Because appellate counsel has no duty to raise issues that lack merit, <u>Chandler v. Moore</u>, 240 F.3d 907, 917 (11th Cir. 2001), and

this issue lacked merit, Wilbur's attorney did not give ineffective assistance by not raising it.[14]

### D. Ground Six:   Whether the government violated Wilbur's Confrontation Clause rights by "hiding" a law enforcement witness

Wilbur contends that the government violated his rights under the Confrontation Clause[15] by "hiding" a witness: Deputy Sid Mickler, a police officer who played some role in the undercover investigation.   See Memorandum at 14-15.   The government never listed or summoned Deputy Mickler as a witness, but some of the government's other witnesses made references to Deputy Mickler's role in the investigation, both at Wilbur's suppression hearing and at trial.   (See Crim. Doc. 85, Suppression Tr. Vol. II at 17, 30-31; Trial Tr. Vol. I at 128-30).

At the suppression hearing, Officer Eugene Tolbert, a police officer who assisted in the traffic stop that resulted in Wilbur's arrest, testified about Deputy Mickler in passing.[16]   Officer Tolbert recalled that Deputy Mickler had informed him a few days before the traffic stop that, according to community sources, Wilbur was a suspected drug

---

[14]      Even if this issue was meritorious, Wilbur did not suffer prejudice because it is unlikely that the Eleventh Circuit would have remanded the case for a new sentencing hearing.   Errors in applying the Guidelines are subject to harmless error review.   See United States v. Dulcio, 441 F.3d 1269, 1277 (11th Cir. 2006).   Even had the Court erred in classifying Wilbur as a career offender, the Court sentenced him far below the advisory 360-months-to-life Guidelines range when it sentenced him to a term of 195 months in prison.   Given such a large variance, a reviewing court very likely would have found that Wilbur's career offender designation was harmless.   See, e.g., United States v. Lane, 435 F.App'x 857, 859 (11th Cir. 2011) (finding harmless error in district court's application of the Guidelines where the advisory sentencing range was 121 to 151 months in prison, but the court sentenced defendant to 108 months).   Accordingly, Wilbur suffered no prejudice from appellate counsel's decision not to raise the career offender issue for direct review.

[15]      "In all criminal prosecutions, the accused shall enjoy the right… to be confronted with the witnesses against him."   U.S. Const. amend. VI.

[16]      Officer Tolbert described Deputy Mickler as the "weed and seed" liaison for West St. Augustine. (Id. at 17).   A "weed and seed" zone is an area designated by law enforcement because of its reputation for having a high incidence of narcotics and crime.

dealer.  Suppression Tr. Vol. II at 17, 30-31.[17]  Officer Tolbert did not immediately recognize Wilbur during the May 2008, traffic stop, but when he learned his identity, his conversation with Deputy Mickler prompted him to call for a drug-sniffing canine.  Id. at 17-18.  The canine later alerted officers to the presence of narcotics in Wilbur's car, which led to his arrest.

At the trial, Norman Sanks testified that he became an undercover informant after an unnamed police officer caught him in possession of crack cocaine sometime in early 2008, at which point Sanks offered to assist the police in an effort to avoid returning to prison.  See Trial Tr. Vol. I at 64-65.  The unnamed officer put Sanks in contact with Officer John Brush, who arranged for Sanks to work as an informant.  Id. at 65, 128-30.  In his trial testimony, Officer Brush revealed that the unnamed officer was Deputy Mickler.  Id. at 128-30.  Officer Brush's testimony was the first time the defense learned that it was Deputy Mickler who arrested Sanks and initiated arrangements for him to work as an informant.  Id. at 152-60.  Trial counsel requested that the government disclose any reports regarding the interaction between Sanks and Deputy Mickler, arguing that it could be Brady or Giglio[18] material.  Id. at 153.  The Court instructed the government to locate any such reports, id. at 157, and the government agreed to do so, id. at 157-58; see also Trial Tr. Vol. II at 15.  Trial counsel's main concern was not so much about the trial, but that the newly discovered information was inconsistent with testimony previously offered at Wilbur's suppression hearing.  See Trial Tr. Vol. I at 152-60; Trial Tr. Vol. II at 199-207.  Counsel urged the Court to revisit Wilbur's motion to suppress and grant it in light of the

---

[17]     Importantly, the government only presented this particular piece of testimony at the suppression hearing, but not at the jury trial.
[18]     Giglio v. United States, 405 U.S. 150 (1972) (pursuant to Brady v. Maryland, the government has a constitutional obligation to disclose impeachment evidence).

testimony regarding Deputy Mickler.  The Court declined the suggestion, explaining that nothing about Deputy Mickler's involvement with Norman Sanks undermined the Court's decision to deny the motion to suppress.  See Trial Tr. Vol. II at 199-207.

Upon review of Wilbur's § 2255 materials, it is unclear whether he claims that the government violated his Confrontation Clause rights by not making Deputy Mickler available for cross-examination at the suppression hearing, or by not making him available for cross-examination at trial.  In an abundance of caution, the Court will consider both arguments.

Preliminarily, the Court notes that Wilbur has procedurally defaulted this claim entirely.  The issue of Deputy Mickler's role in the case was raised and discussed at trial, Trial Tr. Vol. I at 152-60, but appellate counsel did not raise it on direct appeal.  Because the issue was available for direct review but not raised, it may not be raised for the first time on collateral review.  See McKay v. United States, 657 F.3d 1190, 1196 (11th Cir. 2011).  Wilbur could excuse the procedural default if he could show that appellate counsel gave ineffective assistance in failing to raise the claim, Brown v. United States, 720 F.3d 1316, 1333 (11th Cir. 2013), which is precisely what he alleges in Ground Eight.  However, because the claim itself lacks merit for the reasons set forth below, Wilbur has not satisfied this standard.

The Confrontation Clause "is violated when hearsay evidence is admitted as substantive evidence against the defendant, with no opportunity to cross-examine the hearsay declarant at trial."  Kentucky v. Stincer, 482 U.S. 730, 737 (1987) (internal citations and quotations omitted).  The Sixth Amendment, however, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter

asserted." <u>Crawford v. Washington</u>, 541 U.S. 36, 59, n. 9 (2004) (citing <u>Tennessee v. Street</u>, 471 U.S. 409, 414 (1985)).

With respect to Wilbur's suppression hearing, the government did not violate the Confrontation Clause because it did not use any statement of Deputy Mickler's for its content.  When Officer Tolbert mentioned Deputy Mickler's report – about community sources identifying Wilbur as a drug dealer – he did not do so to prove the truth of the matter asserted, i.e., whether Wilbur was in fact a drug dealer.[19]  Nor did the government use Deputy Mickler's report to establish that police had probable cause to stop Wilbur's car (probable cause was based on an officer's belief that Wilbur's car windows were illegally tinted), or even to show that Wilbur's traffic stop lasted a reasonable length of time.  Rather, Officer Tolbert only described what Deputy Mickler had told him to explain his reason for requesting a drug-sniffing dog.  However, because a canine sniff around the outside of a car, if conducted in the course of a traffic stop of reasonable duration, does not even require reasonable suspicion, <u>Illinois v. Caballes</u>, 543 U.S. 405, 408-09 (2005), Officer Tolbert's reason for calling a canine unit was ultimately irrelevant.  Officer Tolbert could have called a canine even if Deputy Mickler had never told him that Petitioner was a suspected drug dealer.  The dispositive issues at the motion to suppress hearing were whether the stop was justified in the first place, whether the duration or "scope" of the search was unreasonable, and whether officers had probable cause to search Petitioner's vehicle pursuant to the automobile exception.  <u>See</u> Report and Recommendation at 18-26.  Neither the United States nor the Court relied on Deputy

---

[19]     The Court does not address, and need not address, whether Deputy Mickler's report qualified as "testimonial."

Mickler's statement to resolve any of those issues.[20]  Because the government did not use any statement of Deputy Mickler's to prove the truth of the matter asserted, or to prove any point of relevance at the suppression hearing, it did not violate Wilbur's Confrontation Clause rights by not making Deputy Mickler available for cross-examination.[21]

With respect to trial, the government still did not violate Wilbur's Confrontation Clause rights because it did not introduce any statement of Deputy Mickler's as substantive evidence.  At trial, the only references to Deputy Mickler were related to how Norman Sanks came to be an informant, and whether Deputy Mickler might have offered Sanks immunity from prosecution in exchange for cooperating with the police.  See, e.g., Trial Tr. Vol. I at 128-30; Trial Tr. Vol. II at 26-27, 33, 38, 63, 67.[22]  The government did not introduce Deputy Mickler's statement that community sources had identified Wilbur as a drug dealer.  Significantly, the government even took care to preempt the defense from unwittingly eliciting testimony about Deputy Mickler's report.  See Trial Tr. Vol. II at 172-73.  Because the government did not use any statement of Deputy Mickler's against

---

[20]     Indeed, any reference to Deputy Mickler's report about Wilbur being a suspected drug dealer was relegated to a footnote in the Report and Recommendation on Wilbur's motion to suppress.  (Report and Recommendation at 9 n.14).

[21]     The Court adds that it is unaware of any Supreme Court precedent holding that the Confrontation Clause applies to a pretrial suppression hearing, see United States v. Garcia, 324 F.App'x 705, 708-09 (10th Cir. 2009), nor is it aware of any Eleventh Circuit precedent so holding.  The courts that have considered whether the Confrontation Clause applies in that context have tended to hold that it does not.  See id. (collecting cases).  Accordingly, this claim may not even be cognizable on habeas review to the extent it raises an issue concerning the suppression hearing.

[22]     Wilbur makes no claim that the government violated its disclosure obligations under Brady v. Maryland with respect to Deputy Mickler.  Wilbur neither cites Brady nor Giglio in Ground Six, nor does he plead that Deputy Mickler could have offered any exculpatory evidence.  To the contrary, Wilbur only refers to "Deputy Mickler's incriminating statements against the Movant."  Motion to Vacate at 11 (emphasis added).  Accordingly, the Court does not consider Petitioner to have raised Brady or Giglio issues.  Even if he had, the Court would likely find no violation.  The only conceivable Brady or Giglio evidence Deputy Mickler could provide would be whether he offered the informant, Norman Sanks, lenience or immunity from prosecution in exchange for cooperating with the police.  However, the government did disclose that the informant was the beneficiary of a cooperation agreement, and trial counsel thoroughly cross-examined the informant on this point in order to impeach his credibility.  See Trial Tr. Vol. I at 60-118.

Wilbur, it did not impinge on Wilbur's right to confront the witnesses against him.[23]  Simply put, Deputy Mickler was not among the "witnesses against" Wilbur for the purposes of trial, so Deputy Mickler's unavailability did not violate Wilbur's Confrontation Clause rights.[24]

### E.  Ground Seven:  Whether Wilbur's § 851 enhancement, on account of two prior convictions for the sale of cocaine under Florida law, was unconstitutional

Wilbur conceded Ground Seven in his Reply.  (Doc. 11, Reply at 7).

### F.  Grounds Two, Five, and Eight:  Ineffective Assistance of Counsel

As with any Sixth Amendment ineffective assistance of counsel claim, a § 2255 petitioner must demonstrate both:  (1) that his counsel's conduct amounted to constitutionally deficient performance, and (2) that his counsel's deficient performance sufficiently prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994).  In determining whether the petitioner has satisfied the first requirement, i.e. that counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance.  Weeks, 26 F.3d at 1036.  The petitioner must show, in light of all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance."  Id.  To satisfy the second requirement, that counsel's deficient performance prejudiced the defendant, the petitioner must show that there is a reasonable probability that, but for

---

[23]    Additionally, the Confrontation Clause does not require the government to produce incriminating witnesses whose statements remain unused.  Cooper v. California, 386 U.S. 58, 62 n.2 (1967).

[24]    Even if the government had violated Wilbur's Confrontation Clause rights, he would still have to show that it was more than harmless error.  Mason v. Allen, 605 F.3d 1114, 1123 (11th Cir. 2010).  Because Wilbur raises the claim on habeas review, he would have to show that the constitutional error "had [a] substantial and injurious effect or influence in determining the jury's verdict."  Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).  Any reference to Deputy Mickler at either the suppression hearing or trial was trivial in relation to the other evidence and testimony presented.  As such, Wilbur has not met this demanding standard.

counsel's error, the result of the proceeding would have been different.  Id. at 1036-37

(citing Strickland, 466 U.S. at 694).  In determining whether a petitioner has met the two

prongs of deficient performance and prejudice, the Court considers the totality of the

evidence.  Strickland, 466 U.S. at 695.  However, because both prongs are necessary,

"there is no reason for a court… to approach the inquiry in the same order or even to

address both components of the inquiry if the defendant makes an insufficient showing

on one."  Id. at 697; see also Wellington v. Moore, 314 F.3d 1256, 1261 n. 1 (11th Cir.

2002) ("We need not discuss the performance deficiency component of [petitioner's]

ineffective assistance claim because failure to satisfy the prejudice component is

dispositive.").

　　　The record either refutes Wilbur's allegations of ineffective assistance, or shows

them to be meritless.

### 1. Ground Two: Whether counsel gave ineffective assistance by not challenging the fact that the jury pool was all-white

　　　Wilbur claims that trial counsel gave ineffective assistance by not objecting that

the all-white jury pool in his case failed to represent a fair cross-section of the community.

Wilbur argues that because the government was going to introduce an audio recording in

which he referred to white people as "crackers," Memorandum at 6, counsel should have

objected because an all-white jury could not have been impartial after hearing such a

recording.

　　　A defendant has a Sixth Amendment right to "the presence of a fair cross-section

of the community on venire panels, or lists from which grand and petit juries are

drawn." United States v. Henderson, 409 F.3d 1293, 1305 (11th Cir. 2005).  In order for

trial counsel to have demonstrated a prima facie violation of this right, he would have had

to show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.  Id.[25]

Most fatal to Wilbur's claim is the fact that there is no evidence in the record that minority members were systematically excluded from the panel during the jury selection process.  Thus, there is no indication that counsel could have raised a viable objection to the venire.  As such, counsel did not render ineffective assistance by not objecting to the racial composition of the jury pool.  See Jackson v. Herring, 42 F.3d 1350, 1359 (11th Cir. 1995) ("[C]ounsel need not pursue constitutional claims which he reasonably believes to be of questionable merit."); Usher v. Mortin, 165 F.App'x 789, 792-93 (11th Cir. 2006) (where petitioner failed to show, among other things, systematic exclusion of African-Americans from jury venire, he had not shown that counsel was ineffective for not challenging the makeup of the jury pool).

Moreover, Wilbur points to no evidence supporting a finding that counsel's decision not to object to the jury venire prejudiced him.[26]  Nothing in the record suggests that, had counsel objected to the jury venire's racial composition, or even had the venire's

---

[25]     While "petit juries must be drawn from a source fairly representative of the community," there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." Taylor v. Louisiana, 419 U.S. 522, 538 (1975).

[26]     The Court recognizes that an independent claim asserting the systematic exclusion of potential jurors on the basis of race would not be subject to harmless-error review. Vasquez v. Hillery, 474 U.S. 254, 263-64 (1986).  However, because Wilbur raises this claim under the guise of ineffective assistance of counsel, it is subject to Strickland's prejudice prong.  Petitioners frequently submit claims under the guise of ineffective assistance of counsel in order to circumvent a procedural default on the underlying claim, but there is this trade-off:  in order to get the claim into court, the petitioners subject their claim to the demanding Strickland standard.

composition been any different, the jury would have returned a verdict of not guilty.   Nor

is there reason for the Court to presume that the all-white jury was biased against Wilbur

because of a reference he made to "crackers" in an audio recording.   Indeed, the Court

specifically instructed the jury not to allow prejudice to influence their deliberations:

> You must make your decision only on the basis of the testimony and other
> evidence presented here during the trial; and you must not be influenced in
> any way by either sympathy or prejudice for or against the Defendant or the
> Government.
>
> You must also follow the law as I explain it to you whether you agree with
> the law or not; and you must follow all of my instructions as a whole.   You
> may not single out, or disregard, any of the Court's instructions on the law.

(Crim. Doc. 109, Court's Final Jury Instructions at 2).   Jurors are presumed to follow a

court's instructions on the law, United States v. Almanzar, 634 F.3d 1214, 1222 (11th Cir.

2011), and Wilbur has not pointed to any evidence to rebut that presumption.   Given the

absence of evidence that the jury was actually biased, and the strength of the

prosecution's evidence in general, there is not a reasonable probability that the jury's

racial composition, or counsel's decision not to object to it, affected the verdict or deprived

Wilbur of a fair trial.

### 2. Ground Five:   Whether counsel gave ineffective assistance by not objecting at trial to the "form" of the evidence

Wilbur argues that counsel performed ineffectively by not objecting to the drug

evidence, because "the form of the substance was not the same as reported in the [police]

Officer's Arrest Report."   Motion to Vacate at 10; Memorandum at 12-13.   The record

refutes this claim because Wilbur himself stipulated that (1) the evidence was cocaine

base and (2) that the chain of custody was proper.   Stipulation at 1-2.   Additionally, the

DEA analyst who confirmed that the substance was cocaine explained that lab testing

altered the appearance of the evidence.  The analyst explained that it was necessary to grind up the rocks of crack cocaine in order to make "a homogenous sample" for testing. Trial Tr. Vol. II at 189-90.  Because lab testing necessarily changed the appearance of the substance, there was no conceivable merit to arguing that the evidence entered at trial was not the same as that seized in the investigation simply because it looked different.  As such, Ground Five is meritless, and counsel did not perform ineffectively by not raising a frivolous objection to the "form" of the evidence.  See Brownlee v. Haley, 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that "[c]ounsel was not ineffective for failing to raise these issues because they clearly lack merit").

In any event, Wilbur's trial strategy focused on challenging the informant's credibility, disputing whether Wilbur was the person from whom the informant purchased crack, and disputing whether the crack cocaine retrieved from his car belonged to him. See Response at 15; see also, e.g., Trial Tr. Vol. I at 99-117; Trial Tr. Vol. II at 131-32, 200-07.  Although challenging the authenticity of the evidence or disputing whether it was actually cocaine base would not have been irreconcilable with the rest of his strategy, it may well have appeared inconsistent with his theory of the case.  Indeed, a jury might have seen a challenge to whether the evidence was illicit narcotics to be an implicit retreat from his identity and non-ownership defenses.  Because the Court presumes that counsel "did what he should have done, and that he exercised reasonable professional judgment," Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999), on this record the Court cannot say that counsel's decision not to object to the "form" of the evidence was professionally unreasonable, particularly when there was a sound explanation for the evidence's altered appearance.

### 3.  Ground Eight:  Whether appellate counsel was ineffective

Finally, Wilbur argues that appellate counsel gave ineffective assistance by failing to raise the following issues on appeal: that the jury pool was all-white (as in Ground Two); that the Court erred by not applying the FSA to him (as in Ground Three); that the Court erroneously designated him as a career offender under the Guidelines by counting two prior drug convictions against him (as in Ground Four); that the form of the evidence had been altered (as in Ground Five); plus one ground not raised elsewhere in his Motion to Vacate – that counsel failed to file a motion for a new trial.  See Memorandum at 18. Wilbur also claims that appellate counsel abandoned him, and that he rendered ineffective assistance by failing to inform him that the Eleventh Circuit had affirmed his conviction, thereby preventing him from petitioning for an en banc rehearing or for a writ of certiorari.  Id. at 19.

With respect to appellate counsel's failure to raise the issues concerning the all-white jury pool, the Guidelines career offender classification, and the altered form of the evidence, the Court has already determined that those issues were meritless.  As such, appellate counsel did not perform deficiently by not raising them for direct review.  See Shere v. Sec'y, Fla. Dep't of Corrections, 537 F.3d 1304, 1311 (11th Cir. 2008) (agreeing that "appellate counsel is not ineffective for failing to raise a meritless issue on appeal").

Nor was appellate counsel ineffective for not contesting this Court's decision not to apply the FSA to Wilbur.  At the time Wilbur appealed, Eleventh Circuit precedent held that the FSA did not apply retroactively.  See Gomes, 621 F.3d 1343; Mickens, 408 F.App'x 253; Bradley, 409 F.App'x 308; Coleman, 416 F.App'x 41.  Because then-existing precedent foreclosed such an argument, appellate counsel was not ineffective for not

pursuing it.  <u>Dell v. United States</u>, 710 F.3d 1267, 1282 (11th Cir. 2013) (finding that counsel's failure to raise an argument did not constitute deficient performance because, in affording a presumption of competence, "it may have been regarded as having been 'a strategic decision to forego a claim that was a loser under the then-current state of the law.'").  Moreover, the Supreme Court had not yet granted certiorari in <u>Dorsey</u> at the time counsel filed the appellate brief, <u>see</u> p. 8, <u>supra</u>, so counsel had no reason to believe that he should preserve the argument in anticipation of a change in the law.  Even if the Supreme Court had already granted certiorari, counsel still would not have been obligated to raise the issue because he could not have predicted the outcome of <u>Dorsey</u>.  <u>Dell</u>, 710 F.3d at 1282 ("In short, it generally does not fall below the objective standard of reasonableness for trial counsel to fail to raise a claim… that undeniably would lose under current law but might succeed based on the outcome of a forthcoming Supreme Court decision.").  Thus, appellate counsel did not render ineffective assistance by not raising the underlying issues discussed in Grounds Two through Five for direct review.

Wilbur mentions in a single sentence that he requested appellate counsel to raise an issue about trial counsel not moving for a new trial, and that appellate counsel was ineffective for failing to raise that issue.  Memorandum at 18.  Wilbur does not discuss a motion for a new trial anywhere else in his § 2255 materials, so this issue is inadequately pled.  Therefore, the Court does not consider it.

Lastly, Wilbur contends that appellate counsel gave ineffective assistance by failing to notify him when the Eleventh Circuit affirmed his conviction, thereby depriving him of the ability to seek <u>en banc</u> review or certiorari review.  Wilbur also contends that appellate counsel "abandoned" him by not raising the various issues Wilbur requested

that he raise.  However, the "right to [appellate] counsel is limited to the first appeal as of right… and the attorney need not advance <u>every</u> argument, regardless of merit, urged by the appellant."  <u>Evitts v. Lucey</u>, 469 U.S. 387, 394 (1985) (emphasis in original) (citations omitted); <u>see also</u> <u>Ross v. Moffitt</u>, 417 U.S. 600, 617-18 (1974) (the right to due process does not extend to the filing of a petition for a writ of certiorari).  Numerous courts have also held that appellate counsel does not render ineffective assistance by failing to notify their client of how or when to seek <u>en</u> <u>banc</u> or certiorari review.  <u>See</u>, <u>e.g.</u>, <u>United States v. Arechiga–Ramirez</u>, 370 F. App'x 784, 785 (9th Cir. 2010) (rejecting § 2255 claim of ineffective assistance of counsel based on failure to advise of right to petition Supreme Court for writ of certiorari); <u>Steele v. United States</u>, 518 F.3d 986, 988 (8th Cir. 2008) (rejecting § 2255 claim of ineffective assistance of counsel based on alleged breach of the provisions of the 8th Circuit's Criminal Justice Act Plan where counsel allegedly "failed to inform petitioner of the procedure and time limits for filing a certiorari petition pro se," finding "[w]e disagree that such violations would create a constitutional right to effective assistance of counsel"); <u>Pena v. United States</u>, 534 F .3d 92, 95–96 (2d Cir. 2008) (rejecting § 2255 claim of ineffective assistance of counsel based on failure of appellate counsel to notify petitioner of right to file for certiorari); <u>Moore v. Cockrell</u>, 313 F.3d 880, 882 (5th Cir. 2002) (rejecting § 2254 claim of ineffective assistance of counsel based on failure of counsel to timely notify petitioner of the outcome of his direct appeal, which allegedly resulted in petitioner being time-barred from filing a discretionary appeal).  Contrary to Wilbur's contention, he had no "due process" right to <u>en</u> <u>banc</u> or certiorari review.  Thus, assuming the truth of his allegations, Wilbur has not identified a cognizable constitutional claim based on appellate counsel's alleged failure to advise him of when

the Eleventh Circuit affirmed his conviction.  Nor did counsel have a duty to raise the various meritless arguments that Wilbur has proposed.  Appellate counsel filed a brief advocating for vacatur of Wilbur's convictions on the grounds that the Court wrongly denied his motion to suppress and wrongly denied a motion for a mistrial.  See generally, Brief of Appellant, United States v. Wilbur, 458 F.App'x 829 (11th Cir. 2012) (No. 11-11396).  Because the Court is not aware of any other issues of merit, the Court finds that the record refutes Wilbur's claim that appellate counsel abandoned him, deprived him of any due process rights, or rendered ineffective assistance in general.[27]

## IV.    Certificate of Appealability Pursuant to 28 U.S.C. § 2253(c)(1)

If Wilbur seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). To make this substantial showing, Wilbur "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335–36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

---

[27]    In his supporting memorandum, Wilbur alleges that appellate counsel was evasive, non-communicative, and did not consult with him. (Memorandum at 18-20).  The Court does not ignore these allegations, and if they are true, the Court would be deeply concerned that counsel did not treat his client with the professionalism and diligence expected of lawyers.  Nonetheless, the Court has not identified any meritorious constitutional grounds for granting habeas relief.

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

As such, and in accordance with the Rules Governing Section 2255 Cases in the United States District Courts, it is hereby

**ORDERED**:

1. Petitioner Clifford Wilbur's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody under 28 U.S.C. § 2255 (Doc. 1, Motion to Vacate) is **DENIED**.

2. Petitioner's "Motion to Set § 2255 Motion for Hearing or, in the Alternative, for Status Conference" (Doc. 17), and Petitioner's "Renewed Motion to Set § 2255 Motion for Hearing or, in the Alternative, for Status Conference" (Doc. 18), are **DENIED AS MOOT**.

3. The Clerk shall enter judgment in favor of the United States and against Clifford Wilbur, and close the file.

4. If Wilbur appeals the denial of the petition, the Court denies a certificate of appealability.   Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed in this case.  Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida this 10th day of November, 2015.

MARCIA MORALES HOWARD
United States District Judge

Lc19

Copies:
Counsel of Record
Pro se party